FRANCIS KAPPERS AND OTHERS v. DAVID W. BLAUL.

142 N. W. (2d) 263.

April 1, 1966—No. 39,798.

*Walter W. Laidlaw,* for appellant.

*Snyder & Joerg,* for respondent Kumm.

*Hunt, Streiff, DeVinny & Young* and *David M. Hunt,* for respondents Kappers.

FRANK T. GALLAGHER, C.

Appeal from an order of the district court denying defendant's motion for judgment notwithstanding the verdicts or a new trial.

The appeal arises out of a rear-end collision which occurred about 4:45 p. m. December 11, 1960, on Highway No. 52 at or near the intersection with Highway No. 60 south of Zumbrota. A car operated by Francis Kappers, in which his son Michael, age 14, and Raymond Kumm were passengers, was proceeding in a southerly direction on No. 52 as it approached the intersection. At about that point, another automobile was stopped preparatory to making a left turn from No. 52 to No. 60. Kappers brought his vehicle to a stop. At about the time the vehicle in front completed its left turn, Kappers' car was struck from the rear by a car owned and operated by the defendant, David W. Blaul.

Kumm and Francis Kappers, individually and also as father and natural guardian of Michael Kappers, each brought suits against Blaul. Liability was contested and the cases were tried together. As a result, the jury found defendant's negligence the cause of the collision and the plaintiffs' injuries. It returned verdicts awarding Kumm $5,500, including special damages of $531.50 for medical and hospital expense; Michael Kappers $4,000, including special damages of $104; and Francis Kappers $3,500, including special damages of $114.

Defendant contends here that the court erred in all cases in submitting to and instructing the jury on the question of damages from the time of the accident to the date of the trial, and in submitting to and in instructing the jury on permanent damages and on the loss of future earning capacity. He contends also that the court erred in the Kumm case in submitting to and instructing the jury as to plaintiff's loss of working time from the date of the accident to the date of the trial and in submitting the question of aggravation of a preexisting condition. Defendant also raises these issues: Were the verdicts rendered on the ques-

tion of damages sustained by the evidence and were they excessive in the light of the evidence?

For the purpose of simplification, the claims of each of the parties will be considered separately.

### PLAINTIFF KUMM'S CASE

Kumm was 69 years old at the time of the trial in June 1964. There is some conflict in his testimony at times, but there is evidence that prior to the accident he managed and worked his 265-acre farm on the east edge of Spring Valley, Minnesota, 200 acres of which were tillable. He hired labor to assist him, but he testified that during the summers prior to the accident his typical work day was about 10 hours and considerably longer during planting and harvesting times. While in the fields he plowed, disked, or dragged, and claimed that the work did not bother him. He also engaged in haying and threshing operations, repaired machinery, picked and shoveled corn, and performed other farm work including chores. He claimed that he was substantially a healthy man before the accident and had never had any trouble with his right shoulder, arm, back, or sense of balance. He admitted that he had some trouble with his hip before the accident; had limped for 3 or 4 years; and that his hip pained him a little and "kind of bothered" him when riding in the fields over rough ground. Except for an ulcer in 1957, he had no occasion to see a doctor prior to the accident and seemed to be healthy.

He said that after the accident he was dazed and "kind of foggy" for a while. He was helped out of the Kappers' car and taken in a patrol car to the Zumbrota Hospital. Some X rays were taken and Kumm was taken to his home that evening. He was confined to bed for a week and to his home two or three weeks. During this time Dr. C. W. Zittleman, an osteopathic physician practicing in Spring Valley, saw him on three occasions. Thereafter, Kumm consulted the doctor at his office on December 30, 1960; January 6, 1961; and January 13. The doctor also examined him again about a week before trial. Kumm said that since the accident he has suffered continuously from headaches; his arm and back were hurt and still hurt him at the time of the trial; and his hip has become worse.

Dr. Zittleman examined Kumm on his first visit. The examination disclosed a marked tenderness at the base of the skull, also in the area between the shoulders and in the lower back and in the area around the left hip. Kumm complained of difficulty in swallowing and of pain in the anterior of the front muscle of the neck. The doctor suggested that Kumm take aspirins when necessary to relieve the pain and apply hot packs on the affected areas of his body. On January 6, 1961, the doctor took X rays of Kumm's hip, dorsal cervical area, and posterior area. The X rays showed evidence of arthritic changes both in the hip and spine, so on January 13, 1961, Dr. Zittleman sent him to the Mayo Clinic. Dr. Zittleman's final diagnosis was "acute exacerbation of a chronic degenerative arthritis" due to the injuries sustained.

Between January 16 and March 7, 1961, Kumm underwent examinations and received treatment at the Mayo Clinic. He said that his treatment at the clinic consisted of heat treatments, aspirin, weight lifting, massage, and other physical therapy. He continued to visit the clinic off and on until April 12, 1961, and returned for a follow-up examination March 27, 1964.

The deposition of Dr. A. J. Bianco, a specialist in orthopedic surgery at the clinic, was read into the record. He was in charge of Kumm's examination and treatment. He reviewed the history and first examination of the patient made by Dr. Eugene Kaufman of the clinic's orthopedic department on January 16. Dr. Kaufman had found Kumm not to be in acute distress at the time of examination, but that he had some tenderness over the lower part of his neck at the back; that there were some cracking or crunching noises and pain on motion of his neck to the right; and that there was also some slight tenderness over the ends of the collar bones.

Dr. Bianco also examined the patient on that date and found some tenderness in the midthoracic spine area to the base of the neck and some tenderness over the right bicipital groove. He found that Kumm's neck and lumbar spine motions were moderately limited and all motions in the left hip were severely limited. The doctor also had routine laboratory tests made and X rays of the affected areas taken.

The doctor stated that it was his opinion that Kumm has permanent

partial impairment to the point that he is unable to perform his duties as a farmer. It was also his opinion based on a reasonable degree of medical certainty that the symptoms precipitated by the accident and the degenerative arthritis aggravated by the accident are most likely permanent.

Dr. Edward Juers, a physician and orthopedic surgeon of the Interstate Clinic, Red Wing, called as a witness for defendant, had examined all of the X-ray plates taken at the Mayo Clinic. He described two of them taken in 1957, which showed the lumbar spine and a portion of the left hip. They showed degenerative and hypertrophic changes; spur formation of the lumbar spine; also degenerative diseases within the left hip; "[t]he degenerative process was already under way." He compared the 1957 plates of the lumbar spine and hip with plates of that area taken in 1961 and 1964. An eye inspection, according to the doctor, showed "probably a little increase in the narrowing of the joint space," which he said was a normal progression of degenerative arthritis. He characterized the disease as it was at the time of trial as "a degenerative arthritis which is moderately well advanced."

At the examination he made before trial, the doctor said that Kumm mentioned his headache; also that he had had discomfort in his hip for years; that his right shoulder was stiff, without normal range of motion, and had caused him discomfort; but that he did not say anything about his back.

Defendant contends on appeal that the testimony relative to Kumm's activities in the operation of his farm is extremely confused. He also calls our attention to purported weaknesses in the medical testimony; seriously questions the extent of Kumm's injuries, if any, resulting from the accident; and contends that his present condition could be the result solely of the degenerative arthritic condition he had prior to the accident.

## PLAINTIFF FRANCIS KAPPERS' CASE

This plaintiff was 47 at the time of the trial. His usual employment, which was seasonal, was that of a truck driver for a construction firm. He also raised some cattle and operated his own truck when his employment terminated for the year. He testified that immediately after the accident, he felt "terribly shook up" and that his head, neck, and legs

hurt, although his legs healed in 2 or 3 weeks. He said that after the accident there was a "terrible hurt in the lower part of my neck or the top of my spine" and that there was an ache there all of the time; that he had headaches one or two times a week, which continued up to the time of the trial; and that he had some difficulty in sleeping. He claimed that prior to the accident he had never been in a hospital as a patient and that his health was good.

Kappers saw Dr. O'Keefe of Spring Valley shortly after the accident and received heat treatments for his back and neck. Between April and August 1961, he visited the Stoike Osteopathic Clinic at Austin where he was examined by Dr. C. E. Stoike and given approximately 26 treatments for his neck. These, he said, relieved him to a certain extent although they hurt at the time of the treatments. The doctor prescribed, according to the witness, "a stiff collar with a sponge rubber on top and bottom and it fit around my neck tight so I couldn't turn my neck." He wore the collar "off and on for quite a spell" and said it was uncomfortable and "chafed me down through the neck."

Dr. Stoike said that he first examined Kappers on April 4, 1961, and that Kappers then complained of headaches, pain in the shoulders, and symptoms in the neck, saying that he had been in an accident on December 11, 1960, and received injuries to those areas. The treatment administered was deep massage and manipulation in the shoulder area and in the neck to extend the muscles there and try to relax them.

The doctor said it was his opinion, based on reasonable medical certainty, that the conditions he found were the result of the accident. It was his further opinion that Kappers would have a certain degree of weakness in that area. Questioned about permanence of the condition, the doctor said he might have some residual weakness for some time in the future but also said "it could get better."

There was some testimony by Kappers relative to his hernia condition. In that connection his attorney stated in his brief:

"* * * [N]o expert medical witness was available at the time of trial to establish causal connection. In light of the trial court's instructions to the jury to disregard any question of compensation for a hernia, the hernia condition is not material to this appeal."

Defendant contends that there was no testimony that Kappers experienced any pain, other than some discomfort off and on; that he had any difficulty in his work or physical exertion; or that the motion in his neck was limited. Defendant complains that the doctor based his testimony and opinion on notes which contained very little information and points out that the doctor stated that some of his testimony was based on the fact that most of the people he had seen who had been in accidents such as Kappers had, had the same type of ailments.

### PLAINTIFF MICHAEL KAPPERS' CASE

Michael Kappers, 18 years of age at the time of the trial, was then employed as a part-time guide in a cave and worked with a farmer when not so engaged. He claims he was in good health before the accident, but that since then he cannot lift anything heavy or do hard work as he did before. He claims that he now has difficulty in operating a tractor in a rough field for more than 1½ hours. He said that his foot hurt after the accident; that he had pain in his right leg; and that immediately after leaving the scene of the accident he went to the Zumbrota Hospital but received no treatment. The day after the accident he said his right ankle bothered him and that his back "began to hurt terribly." The following Tuesday he saw Dr. O'Keefe, who checked his ankle, reflexes, and back. That doctor sent him to the Mayo Clinic where he received a complete examination, had some X rays taken, and obtained a brace. Later he consulted Dr. Stoike, who gave him rub treatments on his back and also used a vibrating machine. He said that he received approximately 26 treatments. The witness also said that prior to the accident of December 11, 1960, he had never had any bodily injuries or illness, had never been a patient in a hospital, and had had excellent health.

Dr. Stoike first examined Michael April 4, 1961. He said that he complained of a quite sore, painful back in the lumbar and lower dorsal area and told him that he received his injuries in an automobile accident December 11, 1960. The doctor made a regular routine examination. His treatment was deep massage, manipulation, traction, and ultrasonic. On movement and manipulation the patient complained of pain. It was Dr. Stoike's opinion that the accident caused injuries resulting in Michael's condition when he examined and treated him in 1961 and that

he suffers some permanent disability. The doctor said that he could not say with positive knowledge whether Michael would still have difficulty 5 years from now, but from past experience was of the opinion he would continue to have some weakness.

In a memorandum attached to its order denying defendant's motions for judgment n. o. v. or a new trial, the trial court said:

"While the jury verdicts might appear large, the court is of the opinion they were not excessive or given under the influence of passion or prejudice. Neither a remittitur of damages nor a new trial on the issue of damages is warranted in this case."

With respect to the Kumm case, the court stated in its memorandum that defendant had raised the question whether or not Kumm could show any loss of earnings up to the time of the trial because he was a self-employed person. The court ruled that loss of earning capacity or power could be shown, but limited the proof of loss to that due to his personal efforts and not arising out of invested capital. The court further stated in its memorandum:

"The court only submitted the question of past loss of earnings in the case of plaintiff Raymond Kumm, but did submit the question of future loss of earning capacity for all three plaintiffs. There was evidence in the record as to future disability and it was for the jury to decide what the damages should be."

The court also said:

"In the cases involving Michael and Francis Kappers as plaintiffs, an osteopath testified as to their injuries and permanency resulting therefrom. The defendant has raised the question as to whether or not an osteopath could so testify. * * * [I]n this case the plaintiffs were complaining of neck and back aches resulting from the accident. These complaints of injuries were in an area and of a nature covered in the field of osteopathy and that the witness, Dr. Stoike, could and, in the court's opinion, did qualify as an expert. This being so, the weight of his evidence was for the decision of the jury."

The trial court cited Althoff v. Torrison, 140 Minn. 8, 167 N. W. 119,

in support of its ruling. In that case we held that if the witness, who was an osteopath, could qualify as an expert, he could testify and that his qualification was a matter for the court to determine.

With respect to the amount of the verdicts, we agree that the defendant has raised questions worthy of consideration. However, it cannot be disputed that an accident did occur on December 11, 1960, in which all the plaintiffs were involved. There was evidence from which the jury could find in each case that plaintiff sustained some injuries and that the defendant's negligence was their proximate cause. The jury, after hearing all the evidence concerning the extent of the injuries, including the doctors' testimony, arrived at the amounts already stated. We are not the triers of facts and, considering the present-day value of the dollar, are not willing to grant a new trial on the issue of damages. It is not necessary, nor within our province, to go into an extended discussion of the evidence to prove or demonstrate the correctness of the amounts of the verdicts. Rather, our duty is fully performed when we have fairly considered all of the evidence and from it have determined that it reasonably supports the verdicts. Maust v. Maust, 222 Minn. 135, 23 N. W. (2d) 537.

We have also considered defendant's other assignments of error with respect to the court's instructions on permanent damages, on the loss of future earning capacity, loss of working time from the day of the accident to the time of the trial, and the question of aggravation of a preexisting condition. It is our opinion, after reviewing the instructions, that no reversible error exists with respect to the issues raised.

Affirmed.